IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA,         ) | |
| ) | CRIMINAL NO.  08-cr-55 |
| Plaintiff,         ) | |
| ) | DEFENDANT'S SENTENCING |
| vs.         ) | MEMORANDUM |
| ) | |
| JEREMY ALLEN GATTON,         ) | |
| ) | |
| Defendant.         ) | |

**TABLE OF CONTENTS**

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  UNDER THE FACTORS SET FORTH IN 18 U.S.C. §3553(a), A SENTENCE OF
     60 MONTHS INCARCERATION IS SUFFICIENT FOR JEREMY GATTON. . . . 5

     A.   In Consideration of the Nature and Circumstances of Jeremy's Offense, the
          Asperger's Syndrome Diagnosis is a Mitigating Factor, and the Diagnosis
          Provides for Effective Treatment of Underlying Issues . . . . . . . . . . . . . . . . . . . 6

     B.   Sentencing Needs Are Best Achieved With a 60 Month Sentence . . . . . . . . . . 7

III. JEREMY GATTON'S GUIDELINE RANGE UNDER U.S.S.G. § 2G2.2
     OVERSTATES THE SERIOUSNESS OF THE OFFENSE CONDUCT AND
     SHOULD BE GIVEN LESS CONSIDERATION THAN OTHER GUIDELINE
     CALCULATIONS BECAUSE U.S.S.G. § 2G2.2 IS NOT BASED ON EMPIRICAL
     EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**I.   INTRODUCTION**

Jeremy Gatton presents a very unique case.  Jeremy has been diagnosed with Asperger's

Disorder; a disorder that likely contributed to his involvement in the current offense. *See*

*Psychological Assessment*, Dr. Sean Terry, dated July 31, 2009, p. 6 [*Hereinafter* Psychological

1

Assessment]. "The essential features of Asperger's Disorder are severe and sustained impairment in social interaction and the development of restricted, repetitive patterns of behavior, interests, and activities." American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000, p. 80 [*Hereinafter* DSM IV]. Accompanying diagnoses included, Depressive Disorder and Anxiety Disorder. *Psychological Assessment*, p. 6. Jeremy is currently 35 years old with no other history of criminal conduct. PSR ¶ 47. In fact, he has lived an otherwise upstanding life, graduating from college, working, and volunteering in his church. He has no history of alcohol or drug abuse. PSR ¶ 65, *see also Psychological Assessment*, p.2. Jeremy is close with his family. He has also developed close relationships with a couple of former pastors he worked with in his church, Pastor Terry Canright and Pastor Mike Finely. Those close to Jeremy describe him as a person of good character.

      This introduction incorporates information from the presentence report, a psychological assessment completed by Dr. Sean Terry, and other personal references, including Jeremy's parents and former pastors. Some of the personal reference information is included in letters submitted to the court, however, additional information will be presented in court through Pastor Finley and Jeremy's parents. It is also anticipated that Dr. Sean Terry will testify concerning his report and conclusions. The following information is intended to provide an overview of Jeremy's individual circumstances for the court's consideration at sentencing.

      Although Jeremy has only recently been diagnosed with Asperger's Syndrome, the disorder has presented significant challenges throughout his life. *See* PSR ¶ 54, and *Psychological Assessment*, p. 1-6. These challenges became apparent to educational professionals

early on, when Jeremy entered school.  As early as first grade, Jeremy was diagnosed as having a "word retrieval problem."  PSR ¶ 54.  He was later diagnosed with high functioning autism, by the University of Iowa Hospitals and Clinics. *Id*.  His parents, however, report much earlier concerns with Jeremy's ability to communicate.  In fifth grade, Jeremy's parents report that was placed in special education classes, remaining in mainstream classes for math and science.  Jeremy is of above average intelligence with a deficiency in social skills.  *Psychological Report*, p. 3-5.  However, he was placed in classes with other special needs children, who had behavioral problems.  He did not feel that he 'fit in' with respect to either placement.  *See* PSR ¶ 54 and *Psychological Assessment,* p. 1-2 (*describing* some educational history and difficulty).

      Jeremy's disorder has had a more generally isolating and profound affect on his life.  Friends, family and professionals have observed Jeremy's social discomfort.  *See Psychological Assessment*, p. 1-3.  Although he is a person of above average intelligence, he struggles and lacks confidence socially.  *Psychological Assessment*, p. 4.  His speech is delayed as he searches for his choice of words with each sentence he speaks and avoids eye-contact.  His parents report that his manner of communicating is often off-putting to others, who do not understand Jeremy has a disability.  This discourages others from taking the time to get to know Jeremy.  He has received ridicule and rejection based on his difficulties with personal interaction.  *See* PSR ¶ 54.  He has come to expect disparaging and rejecting responses from others, but has a strong desire to be accepted. *Psychological Assessment*, p. 4.  In sum, he has lived a lonely life.  Outside of his family and church contacts, Jeremy does not have a social group.  He finds basic social interactions extremely intimidating and difficult.  *Id*.

      He has lived most of his life with his parents.  Although Jeremy has a strong desire to be

more independent, his social deficiencies have made it difficult to obtain good paying jobs. *See* PSR ¶¶ 70-75 (*summarizing* employment history). This difficulty is not based on lack of effort. Those close to Jeremy will attest to his dogged search for better employment as well as to how frustrated Jeremy has been with his inability to find such employment. Jeremy has a strong work ethic, as demonstrated by his employment history as well as his volunteer work. This same determination can be seen in Jeremy's educational achievements. Despite challenges, Jeremy attended and graduated from Augustana College and did not give up until obtaining his degrees. PSR ¶ 68.

Jeremy's parents are excellent support for Jeremy. Because Jeremy has lived in his parents' home his entire life, other than the brief time he lived on campus at Augustana College, when attending school. *Psychological Assessment*, p. 2. When Jeremy was arrested, it was devastating for his parents and an extraordinary adjustment not to have Jeremy around the home. They report that it seemed empty without Jeremy, and they continue to struggle with his absence. They have raised Jeremy to have strong values. He has attended church his entire life. He was taught to work hard and set high goals for himself. Further, he was raised to understand right from wrong. Jeremy generally has an appreciation for the importance of following rules and has demonstrated that throughout his life. Although the current offense involves a lack of judgement, both his parents and Pastor Finely, who worked closely with Jeremy for many years in the church, have observed Jeremy's amenability to adjusting his behavior when given direction. Jeremy's support group will continue to be instrumental in Jeremy's life and a positive influence on him.

It is the social isolation described above combined with the repetitive and/or compulsive characteristics of Asperger's Disorder that likely contributed to Jeremy's offense. *See*

*Psychological Assessment*, p. 5-6 (*describing* the developmental disorder causing preoccupation). His family and others close to Jeremy will describe other innocuous examples in which Jeremy has displayed a similar narrow and unyielding focus.  Pastor Finley will describe positive examples of such behavior, when doing research projects under his direction. These observations are consistent with the diagnostic features described in the *DSM IV*.  Asperger's Disorder is often associated with:

> "...encompassing preoccupations about a circumscribed topic or interest, about which the individual can amass a great deal of facts and information.  These interests and activities are pursued with great intensity often to the exclusion of other activities."  DSM  IV, p. 80.

Jeremy has a great deal of remorse and regret for his offense.  He understands the severity of his actions and that it was an inappropriate area of focus.   However, as noted above, Jeremy has always strongly believed in following rules.  He has lived an otherwise law abiding life.  He has shown an ability to be redirected and an openness to complying with standards communicated to him.  This amenability to direction, combined with the positive influences in his life, and current awareness of his disorder create a good prognosis that Jeremy will not reoffend in the future.

In consideration of the sentencing factors outlined in 18 U.S.C. §3553(a), defense counsel will request a sentence of 60 months.

## II.     UNDER THE FACTORS SET FORTH IN 18 U.S.C. §3553(a), A SENTENCE OF 60 MONTHS INCARCERATION IS SUFFICIENT FOR JEREMY GATTON.

Title 18 U.S.C. §3553(a) states in part as follows: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 of this subsection.  The court, in determining the particular sentence to be imposed, shall consider 1)

the nature and circumstances of the offense and the history and characteristics of the defendant; 2) the need for the sentence imposed a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; b) to afford adequate deterrence to criminal conduct; c) to protect the public from further crimes of the defendant; and d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." In making this determination, there is no presumption that the guidelines sentence should apply. *Rita v. United States*, 127 S.Ct. 2456, 2465 (2007). The District Court must "...make an individualized assessment based on the facts presented." *Gall v. United States*, 128 S.Ct. 586, 597 (2007).

> A. <u>In Consideration of the Nature and Circumstances of Jeremy's Offense, the Asperger's Syndrome Diagnosis is a Mitigating Factor, and the Diagnosis Provides for Effective Treatment of Underlying Issues.</u>

As noted above, Jeremy has been diagnosed with Asperger's Disorder, as well as Depressive Disorder and Anxiety Disorder. The diagnosis of Asperger's Disorder is a significant consideration in evaluating the nature and circumstances of Jeremy's offense. The diagnosis explains many social challenges Jeremy has faced throughout his life, and also provides a context and explanation for some of the repetitive and preoccupied behavior involved in this offense. *See Psychological Assessment*, p. 5-6. The disorder also explains why Jeremy did not fully grasp the seriousness of his conduct or the resulting consequences.

However, with the diagnoses, Dr. Sean Terry also offers a recommended treatment plan that would be beneficial to Jeremy in effectively managing his condition. In fact, Jeremy has never received previous treatment for the Asperger's Disorder or the accompanying diagnoses. Thus, a treatment plan offers a targeted means to address underlying issues. Further, Jeremy

possesses an otherwise natural inclination to follow rules and direction from others, as evidenced by his lack of prior criminal activity and by personal descriptions from those closest to Jeremy. This inclination to abide by rules also supports a positive prognosis that Jeremy would not reoffend.

    B. <u>Sentencing Needs Are Best Achieved With a 60 Month Sentence.</u>

  As noted above, effective treatment of underlying issues related to Jeremy's disorder offers the best assurance of meeting the goal of protecting the public from a future offense. As noted in the Psychological Assessment, an effective treatment plan exists in the community and does not necessitate lengthy incarceration. *Psychological Assessment*, p. 6. Jeremy is a good candidate for a community based treatment plan, as he has no history of other criminal behavior. In fact, his difficulty with social interaction causes him to avoid contact with others, making an offense against a person extremely improbable. *See Psychological Assessment*, p. 5 (*describing* Jeremy as shy, withdrawn and avoiding of social interaction). This social withdrawal is likely what contributed to Jeremy's preoccupation with the computer.

  However, as noted above, Jeremy's parents are very instrumental in his life. They are now very aware of the concerning conduct and would provide strong familial support to facilitate Jeremy effectively addressing his disorder. Jeremy would return to their home upon his release, and his parents would carefully monitor his conduct and his participation in treatment. Jeremy's parents are encouraged by the very specific diagnosis and treatment recommendations and feel relieved to have more clear guidance on how to assist their son.

  Because Jeremy's offense is driven significantly by a developmental disability, the call for punishment is less. A just punishment would account for the very individual characteristics

presented in the case and call for leniency.

Finally, the affect of imprisonment is more severe for Jeremy than it is for the average person. *See* PSR ¶ 56 and *Psychological Assessment*, p. 4 (*describing* the impact of incarceration on Jeremy). Incarceration has been very difficult for Jeremy. The stress of the noise, confusion, and constant contact with other individuals has taken a toll on Jeremy, even manifesting physical symptoms. *Id*. Also, the separation from family has had a greater impact on Jeremy than other individuals, as he is more attached and reliant on his parents than the average 35 year old, due to his disorder. The impact of incarceration, combined with the genuine remorse and embarrassment Jeremy has felt about his offense, provide a strong deterrent to Jeremy. A sentence greater than 60 months would be more than necessary to accomplish sentencing goals.

**III.   JEREMY GATTON'S GUIDELINE RANGE UNDER U.S.S.G. § 2G2.2 OVERSTATES THE SERIOUSNESS OF THE OFFENSE CONDUCT AND SHOULD BE GIVEN LESS CONSIDERATION THAN OTHER GUIDELINE CALCULATIONS BECAUSE U.S.S.G. § 2G2.2 IS NOT BASED ON EMPIRICAL EVIDENCE.**

The recommended guideline range grossly overstates the seriousness of defendant's conduct. Strict enforcement would result in a punishment that is excessive to the crime, undermines respect for the law, distorts the concept of general deterrence, and results in unwarranted sentencing disparities. The presentence report provides a guideline range of 210 to 240 months. This guideline range is the result of enhancements applied to Jeremy's offense level. These enhancements result primarily from aspects of Jeremy's case, that by definition apply in most cases. It is the defense position, as outlined below, that the guideline application under U.S.S.G. § 2G2.2, overstates the seriousness of the offense, is not based on empirical evidence, and provides for enhancements disproportionate to the gravity of the conduct.

The flaw with U.S.S.G. § 2G2.2 is that the average defendant charts very high under the guidelines in comparison to statutory minimum and maximum sentence, regardless of acceptance of responsibility and criminal history.  As noted by the Guidelines Commission, there are "several specific offense characteristics which are expected to apply in almost every case (e.g. use of a computer, material involving children under 12 years of age, number of images).  *See* Amendment 664 to United States Sentencing Guidelines, (November 1, 2004).  The internet provides the typical means of obtaining child pornography, resulting in a two-level enhancement. *See* U.S.S.G. § 2G2.2(b)(6).  Furthermore, as a result of internet swapping, defendants readily obtain 600 images with minimal effort, resulting in a five-level increase.  *See* U.S.S.G. § 2G2.2(b)(7)(D). The 2004 guidelines created an application note defining any video-clip as creating 75 images.  *See* U.S.S.G. § 2G2.2, App. Note 4(ii).  Thus, one email containing eight, three-second video clips would also trigger a five-level increase.  Undoubtedly, as the Commission recognized, some of these images will contain material involving a prepubescent minor or material involving depictions of violence, thereby requiring an additional six-level increase.  *See* U.S.S.G. § 2G2.2(b)(2),(4).  Finally, because defendants often obtain child pornography through a peer to peer, or file-sharing program, most defendants receive a five-level distribution for thing of value enhancement.  *See* U.S.S.G. § 2G2.2(b)(3)(B).  Thus, an individual who viewed a relatively limited illegal content quickly obtains an offense level nearing the statutory maximum for the offense.  In Jeremy's case, his offense conduct is enhanced to an offense level of 40.  Even after acceptance of responsibility, and as an individual with no prior criminal history, he has a recommended guideline range of 210 to 240.  In contrast, his criminal history, overall lifestyle, risk factors and conduct do not present an aggravated case.

The results are illogical because Congress set the statutory range for first time distributors as five to twenty years.  Congress could not have intended to impose such a significant sentence for first time offenders with no prior criminal history, presenting mitigating factors.  Such a result runs contrary to Congressional will.  It is inconsistent with the statutory range that even individuals with very limited offense conduct, no prior criminal history, and no concerning or aggravating relevant conduct face a guideline range far exceeding statutory minimum sentence or even the lower end of the statutory range.  Similarly, such a result is contrary to principal guideline policy - providing harsher penalties to individuals with more significant criminal history scores and aggravated offense conduct.

A comparison to guidelines for two similar offenses demonstrates the absurdity of this result.  First consider the hypothetical of a man who contacts a twelve year-old girl over the internet. Using his age and experience, he convinces her to meet, and the two engage in repeated sex.  U.S.S.G. §2G1.3(a), establishes a base offense level of 24 for the offense.  After a two-level enhancement for unduly influencing the child under U.S.S.G. §2G1.3(b)(2), a two-level enhancement for use of the computer (b)(3), and a two-level enhancement for commission of a sex act (b)(4), the final offense level would be 30. After acceptance, the guideline range for a category I offender would be 70-87 months.

Consider next the aggravated case of Joe Champion, as discussed at *United States v. Kane*, 470 F.3d 1277 (8th Cir. 2006).  Mr. Champion paid to have a mother hold down her nine year-old child while Mr. Champion raped the young girl twice a week for two years.  During these rapes, the child experienced such trauma she passed-out.  The damage to the child physically and emotionally is unimaginable.  Using the guidelines, applying all enhancements,

and granting only acceptance of responsibility, the court determined the guideline range was 151-188 months. *Id.* at 1282.

Comparing these results to Jeremy's case, the guideline results do not logically correspond to the apparent severity of the offense conduct. The case involving child enticement results in a guideline range much less than that in Jeremy's case. Even the very aggravated case of Joe Champion results in a guideline range less than that in Jeremy's case. This comparison is an indication that the stacked enhancements resulting from the Protect Act are of only marginal value when fashioning a reasonable sentence in this case.

An examination of recent changes to § 2G2.2 reveals how this puzzling result came into being, and why this guideline section should be afforded less deference and weight than other guideline sections when fashioning a reasonable sentence.

The Protect Act, Pub. L. No. 108-21 (2003) forced changes upon the Sentencing Commission without study or evaluation. The purpose of the Protect Act was to reconcile various bills, establish a nationwide Amber Alert system to be used in cases of child kidnaping, and to address virtual child pornography. Skye Phillips, *Protect Downward Departures: Congress and the Executive's Intrusion Into Judicial Independence*, 12 J.L. & Pol'y 947, 976-984 (2004) (hereinafter Phillips). As the legislation progressed, Freshman Congressman Tom Feeney proposed an unrelated amendment to the bill that would directly amend various guidelines. *Id. See also United States v. Detwiler*, 338 F.Supp.2d 1166, 1170-71 (D. Or. 2004). Representative Feeney later admitted he was just the "messenger" for two Justice Department officials who authored the provision and chose not to notify or consult the Sentencing Commission. *Phillips*, at 983 n. 185, 986. Debate on the amendment was limited to twenty minutes. *Id*. at 983. The

House later passed the Child Abduction Prevention Act with the Feeney Amendment added. *Id*. at 992-994. Despite objections by the Sentencing Commission, the Chairman of the House Committee on the Judiciary, the Judicial Conference of the United States, and the American Bar Association, that these changes were being made without adequate review and analysis, the Protect Act became law in 2003. *Id*. at 990-992, 991 n.219.

Contained in both the original Feeney Amendment and the final version of the Protect Act, was a direct amendment to U.S.S.G. § 2G2.2, adding up to a five-level increase depending on the number of images possessed. *See Protect Act*, § 401(i)(1)(B),(C). The Protect Act also adjusted mandatory minimum sentences for distribution. In an effort to reconcile the provisions of the Protect Act, the Sentencing Commission felt compelled to raise the base offense level to 22 for trafficking offenses. The Commission observed,

> The Protect Act established five year mandatory minimum terms . . . As a result of these new mandatory minimum penalties . . . the Commission increased the base offense level for these offenses . . . The Commission determined that a base offense level of 22 is appropriate for trafficking because, when combined with several specific offense characteristics which are expected to apply in almost every case (e.g. use of a computer, material involving children under 12 years of age, number of images), the mandatory minimum of 60 months' imprisonment will be reached. *Amendment 664*.

The guidelines are only provided a presumption of reasonableness because it is assumed that each section was "the product of years of careful study." *U.S. v. Claiborne*, 439 F.3d 479, 481 (8th Cir. 2006). Where, as here, it is proven that the guidelines were dramatically skewed upwards by the efforts of two DOJ attorneys who used a novice Congressman to backdoor changes into a major bill, over the objection of the Sentencing Commission which specifically stated that no careful study or review had been allowed, then the presumption is unfounded, and the guidelines should be afforded less weight.

A sentence near the statutory maximum is appropriate for some pornography distributors, but not in the instant case. He neither ran his own website, nor operated a child pornography server. When he was confronted with his offense, Jeremy was candid and cooperative with law enforcement, immediately taking responsibility for his actions. Jeremy has no prior history of criminal behavior, which puts him in an offense category I, under the guidelines. Not only does he have no prior criminal record, there is no history of relevant conduct demonstrating other inappropriate sexual behavior or deviance. The resulting guideline range therefore neither matches guideline philosophy nor comports with the Congressionally established statutory range.

A strict enforcement of this guideline can only undermine public respect for the validity of our system. If we assume, pursuant to 18 U.S.C. §3553(a)(2)(B) that this case affects the behavior of potential offenders, then we should consider carefully the utility of telling society 200 forced rapes of a nine year-old will result in a lower punishment than swapping illegal pictures. Although society must move to end both practices, the rapist is a far more serious danger to society than the person who deals in massive quantities of child pornography, who in turn is a far more dangerous and morally culpable person than Jeremy. A sentence that fails to recognize this reality is not a reasonable sentence.

For all of these reasons, defendant's case represents a unique set of variables which justify substantial departures and variances from the guideline range suggested in the PSR.

## IV.   CONCLUSION

Defendant Jeremy Gatton, respectfully requests a sentence of 60 months in prison, to be followed by a term of supervised release.

FEDERAL DEFENDER'S OFFICE
MidwestOne Bank Building
101 W. 2nd Street, Suite 401
Davenport, Iowa 52801-1815
TELEPHONE:  (563) 322-8931
TELEFAX:  (563) 383-0052
EMAIL: diane_zitzner@fd.org

By: /s/
    **Diane Zitzner**
    Assistant Federal Defender
    ATTORNEY FOR DEFENDANT

cc: Joel Barrows, AUSA
    Kate Tady, USPO

CERTIFICATE OF SERVICE
I hereby certify that on September 3, 2009, I electronically filed this document with the Clerk of Court using the ECF system which will serve it on the appropriate parties.
         /s/