1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF IOWA
 2                     DAVENPORT DIVISION

 3
    UNITED STATES OF AMERICA,        )
 4                                   )
                Plaintiff,           )
 5                                   ) ORIGINAL
                -vs-                 ) CRIMINAL NO. 3:08-cr-55
 6                                   )
    JEREMY ALLEN GATTON,             ) TRANSCRIPT OF
 7                                   ) PROCEEDINGS
                Defendant.           ) SENTENCING HEARING
 8                                   )

 9

10         TRANSCRIPT OF PROCEEDINGS, held before the Honorable John

11  Jarvey, at the Federal Courthouse, Davenport, Iowa, commencing

12  at 10:58 a.m., September 8, 2009, reported by Linda

13  Faurote-Egbers, Certified Shorthand Reporter and Notary Public

14  for the State of Iowa.

15

16                          APPEARANCES

17  Plaintiff by:              JOEL W. BARROWS
                               Assistant United States
18                             Attorney
                               131 East Fourth Street
19                             Davenport, IA  52801

20
    Defendant by:              DIANE S. ZITZNER
21                             Federal Public Defender
                               Suite 401
22                             101 West Second Street
                               Davenport, IA  52801

23

24  Reported by:

25  Linda Faurote-Egbers
    Certified Shorthand Reporter
```

2

1                          INDEX

2    Witness                  Attorney                  Page

3    Sean Terry, Psy.D.       Ms. Zitzner                 5
                              Mr. Barrows                17
4                             Ms. Zitzner                18

5    Danny Lee Gatton         Ms. Zitzner                19

6    Arleta Gail Gatton       Ms. Zitzner                27

7    Michael Finley           Ms. Zitzner                34
                              Mr. Barrows                41
8

9

10

11

12

13

14
     Certificate of Shorthand Reporter                   58
15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  Please be seated.  We are here in the

2     matter of United States of America versus Jeremy Allen Gatton,

3     Criminal Case 3:08-cr-55.  Mr. Gatton is before the Court for

4     sentencing based on his May 24, 2009, plea of guilty to Counts 1

5     and 2 of the July 16, 2008, Indictment.  He is present and

6     represented by Diane Zitzner.  The government is represented by

7     Joel Barrows.

8              In preparation for sentencing I have reviewed the

9     Presentence Report in its entirety.  I also have received

10    psychological assessment, a letter from his pastor, there were

11    victim impact letters, and the defendant's Sentencing

12    Memorandum.

13             Following your review of the Presentence Report with

14    your client, Ms. Zitzner, did you find factual errors in the

15    report?

16             MS. ZITZNER:  Your Honor, there was an objection that

17    we made with regard to the content of Paragraph 69.  We did ask

18    that it be removed.  I don't think it is something material for

19    consideration from the Court for sentencing purposes, but we

20    would renew our request that it simply be removed from the

21    Presentence Report.

22             THE COURT:  The entire paragraph or the reference to

23    him being strange?

24             MS. ZITZNER:  The entire paragraph is what we're

25    requesting.

4

1          THE COURT:  And why is that?

2          MS. ZITZNER:  Mr. Gatton denies that incident

3    occurring and I don't think there's any conclusory evidence

4    that, in fact, the person described as a strange male was, in

5    fact, Mr. Gatton on that occasion so I think that it provides a

6    reference to an incident without any sort of strong showing that

7    it actually occurred and I don't think it is material to the

8    content of presentence investigation.

9          THE COURT:  Mr. Barrows?

10          MR. BARROWS:  It is almost immaterial to presentation

11    here today, Your Honor.  I have no problem with it.

12          THE COURT:  We will amend the Presentence Report,

13    Paragraph 69 will be deleted.  Do you have other concerns about

14    the Presentence Report?

15          MS. ZITZNER:  No, Your Honor.

16          THE COURT:  Mr. Barrows, did you find factual errors

17    in the report?

18          MR. BARROWS:  The government has no objections, Your

19    Honor.

20          THE COURT:  The Court finds finds that the Presentence

21    Report is factually accurate as to all matters.  Based on the

22    facts set forth in the Presentence Report, the probation office

23    determined that Mr. Gatton has an offense level of 37, a

24    criminal history category of I, which under the advisory

25    Guidelines would suggest a range of imprisonment between 210 and

1   240 months.

2           I would hear first from you, Ms. Zitzner, and then

3   from Mr. Gatton and then from Mr. Barrows as to the sentence to

4   be imposed.

5           MS. ZITZNER:  Your Honor, we actually do have

6   witnesses we'd like to present on behalf of Mr. Gatton.  The

7   first witness would be Dr. Sean Terry and the Court should have

8   a copy of his reports.

9           THE COURT:  I do.  Please come forward, sir.

10                        SEAN TERRY, Psy.D.,

11  witness herein, called as a witness by the defendant, after

12  having been first duly sworn, was examined and testified as

13  follows:

14                          EXAMINATION

15  BY MS. ZITZNER:

16      Q.   Dr. Terry, could you please state your full name for

17  the Court?

18      A.   Sean Terry.

19      Q.   And what is your current position, Dr. Terry?

20      A.   I'm a licensed clinical psychologist in private

21  practice in Illinois.

22      Q.   And how long have you served in that position?

23      A.   About 18 months.

24      Q.   And prior to this position what type of experience and

25  training did you have for your profession?

1      A.    I worked as a licensed counselor prior to being a

2 licensed psychologist since 1996 and I've had various positions

3 and the position I had prior was working at the VA Hospital,

4 working with veterans, doing evaluations, I also worked in a

5 group private practice in Palos Heights, Illinois, doing things

6 similar to what I am doing right now.

7      Q.    Okay.  In what type of position was that?

8      A.    Well, I -- I did my post doctoral fellowship before I

9 got licensed and I worked there for about two and a half years.

10     Q.    And could you briefly describe your education?

11     A.    My education, the highest education I completed was a

12 Doctor of Psychology or Psy.D. from the Edwards School of

13 Professional Psychology, is equivalent to a Ph.D.

14     Q.    And what type of experience do you have in completing

15 psychological assessments?

16     A.    Ever since my training in the beginning of 1996, you

17 know, I had courses and practicum and rigorous training in

18 completing various psychological testing reports and so -- and

19 then that's just increased over the years as I've gained more

20 experience and more independence with the licensing.

21     Q.    And in your current position in private practice is

22 that part of the role that you fulfill in that position?

23     A.    Yes.

24     Q.    All right.  And what -- what role does that fill in

25 your current profession?

1      A.    I would say about 30 -- 30 to 40 percent of my, you

2   know, practice is psychological testing, assessments, depends on

3   the referral question, sometimes they're forensic, but most

4   often they're people coming in, you know, or being referred to

5   me for various referral questions and then the rest of the time

6   is spent with treatment, therapy and treatment.

7      Q.    Are you familiar with the particular disorder of

8   Asperger's?

9      A.    Yes.

10      Q.    Would you briefly describe what that disorder is?

11      A.    It's basically, you know, it used to be called a high

12   functioning autism and if that gives you a sense of it is just a

13   higher functioning version of the more severe autistic disorder

14   and it's basically the -- you need to have impairment in two

15   major areas, the first would be like social interaction,

16   different ways that a person -- and it varies from, you know,

17   person to person, but marked impairment in social interaction,

18   inability to read social cues, inability to share experiences

19   with others appropriately, so -- and be spontaneous, you know,

20   so -- and there could be a lot of shyness and guardedness so

21   that the person is just not on the same page socially so

22   therefore they become alienated or, you know, rejected from

23   other social groups.

24      Q.    Does that social impairment vary from person to

25   person?

1      A.    It does depending upon, you know, the level of, you

2   know, they can have a unique personality with the Asperger's

3   disorder so some might be a little more outgoing, some might be

4   really shy, and some might be more impulsive than others, so it

5   can look different.  If you look in the DSM-IV, you know, it

6   basically needs one of like four or five so that -- that's how

7   it can vary.

8      Q.    And you indicated that there are two components, one

9   being the social impairment, and what is the other component?

10      A.    The other component is the way its rephrased is like

11   repetitive stereotyped or ritualistic behavior patterns, a

12   person would have like a real narrow, intense interest in

13   something that, you know, is so narrow and intense and can be

14   repetitive to the point of it's inappropriate, you know,

15   compared to how someone normally is interested in something and

16   it's the exclusion of other -- other interests basically.

17      Q.    And can that be a temporary interest, meaning could

18   that interest change to different topics?

19      A.    It did.  I mean, as you know, like a child where this

20   is usually diagnosed in like, you know, later childhood, it

21   might be more something on the childhood level whereas they get

22   older, it could become something more adult oriented; but yeah,

23   it can change.

24      Q.    Now, with respect to the Asperger's disorder, I want

25   to get back more specifically to Jeremy Gatton.  Did you have an

1   opportunity to perform an assessment of Jeremy Gatton?

2        A.   Yes, I did.

3        Q.   And what kind of testing did you do as part of that

4   assessment?

5        A.   I did a standard clinical interview which is probably

6   the most important, just talking with him and asking him, you

7   know, a series of questions ruling out any mental disorders and

8   getting a history and then in addition to that I did a Wechsler

9   intelligence scale which is the intelligence test most widely

10  used, I did a full -- full test with that and then a personality

11  test which would be for like personality, emotional, social

12  functioning which is the Millon Multi-Clinical Axial Inventory,

13  MSMI-III is the acronym for that, and then that was with Mr.

14  Gatton and I also interviewed his mother and father and

15  administered a rating scale that is used for Asperger's disorder

16  with them.

17       Q.   And as a result of this evaluation did you come to any

18  conclusions or diagnoses?

19       A.   After -- after putting all the results together, it

20  was -- to me it was very clear that he suffers from Asperger's

21  disorder.

22       Q.   And can you explain how you came to that conclusion?

23       A.   Well, he -- he had had a history from the University

24  of Iowa records, I mean, there was not a whole lot of records

25  from there, but it was clear -- it was stated that he was

1  diagnosed with high functioning autism from the time he first

2  went there and at that point maybe Asperger's disorder was not

3  more widely used as a term so I had some history, but even as I

4  interviewed him and his most recent behavior fit, you know, well

5  -- very well into the diagnostic criteria for the Asperger's

6  disorder and weren't better explained by any other, you know,

7  mental disorder.

8      Q.   What type of social impairment did you observe

9  relating to Mr. Gatton?

10      A.   Actually in the interview or at the time --

11      Q.   In the interview -- to begin with, let's focus on the

12  interview.

13      A.   Okay.  I noticed with Mr. Gatton that he -- he was

14  very -- his -- like, for instance, his poor eye contact, he

15  didn't -- he wasn't, you know, he didn't engage real well

16  socially and didn't, you know, participate in the normal social

17  exchange that you would expect.  He was very quiet and had his

18  head down a lot of the time and --

19      Q.   Did he make eye contact as you would expect in a

20  conversation?

21      A.   Much less so than I would expect.  I mean, he did

22  occasionally when he was answering a question might look up

23  momentarily, but after I would ask him a question, he went on

24  and on a lot, you know, like to a point of I was getting way

25  more information from the question than I wanted or that I

1   needed and I would have to tell him okay, I need to ask you

2   another question and even after several times he still didn't

3   really have much of an ability to pick up on, you know, that I

4   need shorter answers so that was missing a social cue that I was

5   pretty direct about.

6        Q.   And did the conversation have the same kind of

7   exchange between two people that you would typically have in a

8   conversation?

9        A.   No, I would say it was -- even though we were in a

10  contrived situation, it is not a normal social interaction, it

11  was -- normally you can still have a back and forth in a fairly

12  normal social conversation, I would say it was very restricted

13  and like I said, I would ask a question and he would go on and

14  on and he was very I guess limited in his ability to, you know,

15  kind of follow along what I was trying to ask him and would get

16  off track easily and I would say he was just very awkward in how

17  -- in dealing with a social situation.  He just felt awkward to

18  me.

19       Q.   Did you observe any sort of anxiety or lack of

20  confidence in his social interaction?

21       A.   I think so.  I mean, and he was open about that in his

22  history acknowledging that he -- from being young, you know,

23  when he was bullied as a kid and had not had a whole lot of

24  success in social situations so there was a long history and he

25  admitted that, that that carried up through to today, you know,

1   at the time that I evaluated him where he lacks self-esteem and

2   confidence and gets very anxious and we were in a one-to-one

3   situation where I think it would be easier than a group of

4   people would be even harder.

5       Q.   I think you're familiar as well in his youth when he

6   had diagnoses that was provided as a word retrieval problem, do

7   you recall reading something to that effect?

8       A.   Yeah.

9       Q.   Did esteem have anything that you might describe as a

10  word retrieval problem?

11      A.   I think that's, you know, I didn't mention that

12  specifically in my report.  I did mention that he had, you know,

13  above average language development, but that -- that would be

14  more on the superficial -- like superficially developed, you

15  know, language development, but I would say that yeah, he had a

16  hard time coming up with the appropriate words for -- for what

17  the question would be and I think that may explain why he would

18  be silent for long periods of time too as he was trying to think

19  of words.

20      Q.   Okay.  And that's what I was trying to have you

21  describe is kind of that silence that you just referenced, could

22  you --

23      A.   Right.

24      Q.   -- elaborate on that a little bit?

25      A.   Sure.  You know, I would ask him a question and he

1    would, you know, once he would answer it, he would go on and on;

2    but there were also times where he would stop and pause, you

3    know, as if he was trying to think of what he was trying to say

4    and, you know, that took a lot of time.  He clearly was having,

5    you know, he wasn't done answering the question, he was trying

6    to think of something, but it was in a normal day to day, I

7    mean, that would have been way too much time and I think someone

8    would not have the patience to stay and, you know, let him

9    continue to think so that's -- I mean, I think I would say that

10   it took a lot longer than the normal evaluation, even in the

11   testing because of that.

12        Q.   Now, you're aware that he is currently charged with

13   possession and receipt of child pornography, is that correct?

14        A.   Yes.

15        Q.   Would this repetitive conduct that you have talked

16   about with Asperger's, would that possibly contribute to someone

17   committing an offense of that nature?

18        A.   Absolutely.  I mean, I -- I mean, the research I've

19   done is that there is a higher percentage of Asperger's disorder

20   people who suffer from Asperger's in the -- in criminal

21   populations than the normal and I think part of that is the --

22   the repetetive stereotyped, I'll probably use those terms a lot

23   because that's the terms they identify in the diagnosis, the

24   repetitive, restricted, stereotyped kind of behaviors and if

25   that interest is, you know, developed, then it can become very

1  excessive and as to whether it would contribute to something --

2  I don't know if you asked that or not -- like would that

3  contribute to him engaging in something such as --

4      Q.    Collecting images in the computer.

5      A.    Yeah, I mean, and the other part of that, I mean, it

6  doesn't have to be like images such as child pornography, an

7  Asperger's person is I guess, you know, attracted to -- but I

8  think there is more likelihood of a sexual, you know, there's a

9  lot of talk in the literature about sexual frustration due to

10  not having maybe previous, you know, dating experiences and so

11  what would be a normal, you know, kind of viewing of some kind

12  of pornography for some person for him would become very --

13  because of his Asperger's disorder would become very excessive

14  and repetitive because of the nature of his disorder.

15      Q.    Now, could that repetitive and you used the word

16  obsessive behavior, would that also be reflected in perhaps

17  other researching or collections that the person might have?

18      A.    Sure, absolutely.

19      Q.    So is it typical with that disorder to kind of have

20  that repetitive behavior no matter what the topic may be?

21      A.    Yes, it just depends on the topic or whatever the

22  topic is.

23      Q.    Now, with respect to the diagnosis that you had for

24  Jeremy, what type of treatment would you recommend?   Is there a

25  treatment that could help him deal with some of the obstacles

1 that are presented through his disorder?

2      A.    I mean, there are -- the most standard I guess

3 recommended treatment would be like -- I guess I would call a

4 multimodal approach addressing the behavior -- a lot of

5 behavior-related therapy and I think Asperger's, people with

6 Asperger's respond well to like very here and now, you know,

7 behavior modification type of techniques and being in an

8 environment, that's I want to say, safe, safe, loving, kind of

9 supportive, encouraging rather than, you know, a more hostile,

10 loud, distracting environment.

11           If you think about treatment, there are -- the

12 traditional therapies don't work as well with someone with

13 Asperger's because they have the difficulty thinking long-term

14 and processing, not that they're not capable intellectually, but

15 they generally don't, you know, respond well to like long-term,

16 insight morbidities, but more behavior you need to do this right

17 now because it is going to get you here so very stepwise kind of

18 treatment.

19      Q.    Would there be an ability to provide treatment that

20 would give social skill training or --

21      A.    Yeah.

22      Q.    -- or improve social skills?

23      A.    Yeah, I guess I didn't go on, social skills training

24 is probably the biggest aspect, you know, related to behavior

25 that they would work on in treatment and that could be

1   individually or with a group and lastly medication can be

2   helpful to deal with some of the obsessive -- it is not

3   obsessive-compulsive disorder, it can look like that, but there

4   are some medications that work with obsessive-compulsive

5   disorders which also help with some of the repetitiveness of

6   Asperger's and then any co-occurring anxiety or depression

7   medications to help with that as well.

8       Q.   And then lastly I just want to talk to you a little

9   bit, did you have any impressions or observations about the jail

10  environment as far as how Jeremy would cope with that in light

11  of his disorder?

12      A.   You know, I noticed that he was very depressed, you

13  know, he was -- I would say he was disheveled and not knowing

14  him before, you know, I don't know what his baseline is outside

15  of that, but he definitely appeared depressed and anxious and,

16  you know, like he was not tolerating that very well.

17          After talking to his mother and father, and that was

18  confirmed that he definitely is functioning at a lower level

19  even physically, you know, like the -- there's more physical

20  complaints and I think that environment would be difficult for

21  someone like Mr. Gatton.

22          MS. ZITZNER:  Thank you.

23          THE COURT:   Mr. Barrows?

24

25

1                        EXAMINATION

2    BY MR. BARROWS:

3        Q.    Just a couple of questions.  Good morning, Dr. Terry.

4        A.    Good morning.

5        Q.    I just want to make sure that I understand your

6    testimony accurately.  You are not saying that Asperger's causes

7    an interest in child pornography, correct?

8        A.    Correct.

9        Q.    So if I understood you correctly, Asperger's doesn't

10   cause the initial interest, it makes the interest more -- I use

11   the term obsessive, I think maybe that's the term that you used,

12   is that right?

13       A.    Correct.

14       Q.    So this could happen with any developed interest, is

15   that right?

16       A.    Sure, and I think, you know, like I said in the

17   research, there is, you know, there seems to be more of a

18   propensity for criminal actions in an Asperger's population than

19   the normal so there might be, you know, while it could be a

20   noncriminal-related interest, I think there does seem to be some

21   pull to, you know, some types of criminal behavior.

22       Q.    You say a propensity.  Is there a percentage that you

23   can attach to that?

24       A.    No, you know, I guess if I could explain it maybe a

25   little more, that would maybe help, where the lack of empathy or

1  inability to read like -- or inability to see long-term

2  consequences of behavior, I would say that that contributes to

3  putting on the brakes or stopping that behavior once it starts,

4  you know, a normal person might stop it right away whereas

5  someone with Asperger's would have a hard time seeing, you know,

6  the benefit in stopping and what the long-term consequences

7  could be.  In addition to that, the repetitive kind of behavior

8  that makes it more, you know, more of a problem.

9       Q.   This repetitive behavior is common?

10      A.   Yeah.

11           MR. BARROWS:  I have nothing further, Your Honor.

12           THE COURT:  Anything else?

13           MS. ZITZNER:  Just real quick.

14                     FURTHER EXAMINATION

15  BY MS. ZITZNER:

16      Q.   Dr. Terry, I just want to make sure that I clarify

17  one thing.  When you're saying the person with Asperger's may

18  not see the long-term consequences of an action, could that

19  person be redirected or provided some insight onto -- into those

20  social --

21      A.   Sure, I think that's where the treatment part comes in

22  and, you know, as to learn -- learn how to read some of these

23  cues and how to, you know, check their behavior, you know,

24  through some monitoring and, you know, checking in with people

25  and learning some techniques for -- that can definitely be

1    taught, sure.

2              MS. ZITZNER:  Thank you.

3              MR. BARROWS:  Nothing further, Your Honor.

4              THE COURT:  Thank you.

5              THE WITNESS:  Thank you.

6              MS. ZITZNER:  Your Honor, I would call Danny Gatton.

7                        DANNY LEE GATTON,

8    witness herein, called as a witness by the defendant, after

9    having been first duly sworn, was examined and testified as

10   follows:

11                        EXAMINATION

12   BY MS. ZITZNER:

13       Q.   Mr. Gatton, could you state your name for the record,

14   please?

15       A.   Danny Lee Gatton.

16       Q.   And Mr. Gatton, where do currently live?

17       A.   We live in 6028 Valley Drive in Bettendorf, Iowa.

18       Q.   Where do you work, Mr. Gatton?

19       A.   Rock Island Arsenal.

20       Q.   How long have you worked there?

21       A.   27 years.

22       Q.   And the address that you just provided, is that the

23   same residence where you previously lived with Jeremy?

24       A.   Yes, it is.

25       Q.   I want you to just describe a little bit of -- before

1   Jeremy's arrest your day-to-day relationship with Jeremy.

2        A.   We were very close to him.  He lived at home the whole

3   time, he went to Scott Community for two years so he lived at

4   home and then when he went to Augustana he was there during the

5   week, but he came home every weekend.

6        Q.   So throughout his life he's been pretty much a major

7   part of your household, is that fair to say?

8        A.   That is correct.

9        Q.   And with Jeremy, I know we have talked about this with

10  Dr. Terry that there's some special challenge Jeremy has had,

11  have you seen those?

12       A.   Yes, very much so.  I mean, the doctor described

13  Jeremy to a T.

14       Q.   And one of the things that was spoken of was some of

15  the social impairment or some challenge Jeremy has socially.

16  Can you describe as a parent when you first saw that?

17       A.   When he was young.

18       Q.   When you say young, what do you mean by that?

19       A.   Grade school, preschool.  Grade school.  His mother

20  knows more of that kind of stuff than I do.

21       Q.   Okay.  But definitely in childhood?

22       A.   Yes, yes.

23       Q.   And did that continue throughout his adulthood?

24       A.   Yes, it did.

25       Q.   And when we talk about social impairment, what kind of

1  things did you see just in normal terms as a parent?

2      A.   He had a very difficult time socializing, how to talk

3  with other people, you know, the doctor described the fact where

4  people were -- tend to be turned off because Jeremy took so long

5  to formulate an idea, people couldn't -- he wouldn't speak until

6  he had an idea formulated so people, you know, if you don't get

7  a quick answer, you are turned off and figure well, he's not

8  concerned, and terminate.

9      Q.   Did it make him more socially isolated than the

10  average child?

11     A.   I believe it did, yes.

12     Q.   You had another son as well, is that right?

13     A.   Yes.

14     Q.   And he is a couple years younger than Jeremy?

15     A.   Yes.

16     Q.   Did you notice a difference in their social

17  interactions growing up?

18     A.   Oh, yes, very much so.

19     Q.   And how would you compare that?

20     A.   Jeremy -- his brother Benjamin is very -- well, he's a

21  realtor so he's very interactive, can walk up to anybody, any

22  time, and carry on a conversation.

23     Q.   And how does Jeremy react in social situations?

24     A.   Again, he's kind of stand-offish a little bit.  I know

25  my wife is a person that would talk to us and, you know,

22

1   describing Jeremy, if you took a group of people, where would

2   Jeremy be, and he'd be walking around the outside trying to

3   figure out how to get in to talk with them.  He just found it

4   very difficult to communicate with other people.  You know,

5   jokingly when he was at home I'd stand him up and I'd go Jeremy,

6   I mean, earth to Jeremy to kind of jokingly get his attention so

7   he would communicate a little better.

8       Q.   What about the manner in which he would communicate

9   with people such as eye contact, manner of speaking, those type

10  of things?

11      A.   Again, the doctor very well described it.  Jeremy

12  found it very, very difficult to have eye contact with people

13  when he talked to them.  He would be looking to the side, down,

14  whatever, you know, and again, he'd have the slow speech, the

15  slow formulation of thoughts.  He'd eventually communicate, but

16  not at the rapid pace most of us do.

17      Q.   What about the focus on a particular interest or

18  topic, how would you describe Jeremy in that area?

19      A.   I would describe him like a bulldog.  If he got locked

20  onto something, he was very tenacious until it was the -- the

21  project was completed or whatever.

22      Q.   Would he then move on maybe later to a different

23  topic?

24      A.   That's correct.

25      Q.   And you also talked about describing Jeremy as someone

1  that might be on the outside of the crowd trying to find a way

2  to get in.  Did he have a lot of social interactions with peers

3  growing up?

4       A.   No.  His mother might be able to better -- but I don't

5  think Jeremy had any real friends in school.

6       Q.   And what about his ability to follow rules or the

7  importance that Jeremy would place on rules?

8       A.   He very much was a rule person.  In grade school he

9  went out for flag football and I would go to the games and I

10  volunteered to be a ref so that I would be closer to Jeremy so

11  if he -- because he knew he was following the rules, but if the

12  other one didn't, it would upset him and I would be there to

13  calm him down so he could continue on.

14       Q.   With respect to some of the social challenge that

15  Jeremy has had, have you ever had to redirect him and explain to

16  him no, that is not a appropriate, and suggest a different way

17  of handling something?

18       A.   Yes, we have.

19       Q.   And can you explain briefly how does that work with

20  him?   I mean, does he --

21       A.   It would normally -- it would take a little longer

22  than you would with a normal person; but after sitting down with

23  him and working with him and showing how he was headed in the

24  wrong direction, that this is where he needed to go, in most

25  cases he would change that course.

1    Q.   I just wanted to talk to you a little bit too about

2  you've seen Jeremy as he's handled the situation he's currently

3  in with the case.  Have you had any sort of response from him or

4  feedback from him about how he feels about his conduct in this

5  case?

6    A.   He's very, very remorseful and he realizes what did he

7  was completely wrong.

8    Q.   Okay.

9    A.   He's --

10    Q.   Is that characteristic of Jeremy?  Is that

11  characteristic of Jeremy to look back on his behavior and take

12  responsibility for it?

13    A.   Yes.

14    Q.   Okay.  So with respect to this particular case have

15  you seen him have any kind of emotional reaction to it like such

16  as feelings of embarrassment or --

17    A.   Yes.

18    Q.   -- regret?

19    A.   Yes, he writes us every week and his letters are long

20  and drawn out and you can tell in his letters that, in many of

21  them, that he very much regrets what he has done and realized he

22  selected -- not in these exact words -- but had selected the

23  wrong course of action.

24    Q.   And I wanted to talk to you too just briefly about the

25  effect that just being in jail has had on Jeremy.  Have you seen

1   any effect on him?

2       A.   Oh, very much so.  You can tell in his physical

3   appearance he's had a lot of physical problems according to

4   Jeremy and, you know, he has to see the nurse before he can see

5   the doctor and they're not finding it so it's very much weighing

6   upon him because Jeremy was not a person that liked a lot of

7   noise and, of course, in the jail situation there's all kinds of

8   noise going on.

9       Q.   Okay.  And when you say physical impairment, do you

10  have any theories as to why he has these physical complaints?

11      A.   Just from the confinement, you know, Jeremy was very

12  much a pattern person, he had his things that he did, and that's

13  completely shattered it and then from the standpoint again, we

14  go back to the noise and they're always -- Jeremy is not much of

15  a sports person, of course up there they've always got to have

16  football, basketball, something on like that and they're always

17  hollering and again, the noise.

18      Q.   And with respect to Jeremy as a parent, you probably

19  know him better than most anyone, how would you characterize the

20  good qualities in Jeremy?

21      A.   He's a very -- he's a very caring person really when

22  you get -- you get to know him well, he -- he will basically

23  give you the shirt off his back.  If anybody needed any help

24  doing anything, Jeremy was one of the first to volunteer to be

25  there, he'd arrange his schedule accordingly, when you look at

1    him you can see he's very physical so he can lift about -- and

2    move about anything so, you know, very helpful.  He -- even

3    though he had a communication problem, he did like to be around

4    several people.

5         Q.   Was there ever throughout the time that he's grown up

6    till adulthood any complaints of him being inappropriate or

7    violent or anything of that nature?

8         A.   Not to my knowledge.

9         Q.   And when Jeremy is ultimately completed with his

10   sentence, what involvement would you and your wife have with

11   continuing to help Jeremy or be part of his life?

12        A.   He would be at home and whatever was mandated or

13   required by whoever, we would see that that was taken care of.

14        Q.   I know that you heard the diagnosis and some of the

15   recommendations from the doctor today and we've talked about

16   them in the past.  Would those be things that you would pursue

17   and encourage Jeremy to participate in?

18        A.   Very much so.  Very much so.

19             MS. ZITZNER:  I have nothing further.  Thank you, Mr.

20   Gatton.

21             THE COURT:  Mr. Barrows?

22             MR. BARROWS:  I have no questions for Mr. Gatton, Your

23   Honor.

24             THE COURT:  Thank you, sir.

25             MS. ZITZNER:  Your Honor, I call Gail Gatton.

1                       ARLETA GAIL GATTON,

2    witness herein, called as a witness by the defendant, after

3    having been first duly sworn, was examined and testified as

4    follows:

5                          EXAMINATION

6    BY MS. ZITZNER:

7        Q.   Ms. Gatton, could you state your full name for the

8    record, please?

9        A.   Yes, Arleta Gail Gatton.

10           THE COURT:  Would you move that microphone closer to

11   your mouth there?   Thank you.

12   BY MS. ZITZNER:

13       Q.   Where do currently live?

14       A.   At 6028 Valley Drive in Bettendorf.

15       Q.   And again, that's the same home where Jeremy was

16   living prior to this incident?

17       A.   Yes, yes.

18       Q.   And where are you currently employed?

19       A.   I work at Superior Labels.

20       Q.   And how long have you been in that employment?

21       A.   I've been there for three -- almost three years.

22       Q.   I want to talk to you a little bit about Jeremy,

23   similar questions that I just asked your husband.  We are aware

24   that Jeremy has some challenges socially.  When did you first

25   become aware of those?

1     A.    When he went to preschool, the teacher told me that I

2   needed to talk to him because he was making the other kids

3   nervous because he couldn't remember their names.

4     Q.    And did -- what did you do when you got that feedback?

5     A.    You know, I thought what am I supposed to do if he

6   can't remember their names, you know, I didn't know why he

7   couldn't remember their names.   He was a four-year-old.

8     Q.    When did you first seek out some type of professional

9   assessment?

10    A.    When he went to kindergarten, his teacher and I had

11  sometimes almost an every morning phone call.   If he had a bad

12  morning getting ready for school, I would call her and say it is

13  going to be a bad day and I talked to the school counselor, I

14  said there's something wrong, you know, he needs some kind of

15  help and she says well, we'll just have to wait and see and one

16  day she was actually called to the kindergarten room because his

17  teacher needed to leave the room for a phone call or something

18  and when she was relieved of that duty, she immediately called

19  me and she says you're right, he does have a problem, I don't

20  know what it is, but I will see what I can do to get some

21  testing done and then after that we went to -- he went to

22  hospital school at the University and spent the month there, he

23  was the beginning of first grade.

24    Q.    And what was the result of that stay?

25    A.    That's when he got the diagnosis of word retrieval

29

1   problem is that he could hear, he could understand, but it just

2   took him a long time to make a response.

3       Q.    And was there a subsequent diagnosis to the word

4   retrieval problem?

5       A.    No.

6       Q.    Did -- at one point was there a label of high

7   functioning autism placed on Jeremy?

8       A.    He went back -- I thought he was doing wonderful and

9   so I, you know, they never asked me to bring him back or

10  anything, but I contacted them or had the school contact them

11  again when he was in fourth grade and went back again for

12  re-evaluation and that's when they came up with the high

13  functioning autism.

14      Q.    And was there any sort of accommodation made then

15  through his school years with that diagnosis?

16      A.    So then after that they thought he needed to be in a

17  behavior disorder class and so he was in a behavior disorder

18  class in his fifth and sixth grade in the Davenport School

19  District because that's where that classroom was and it wasn't

20  -- it was with a bunch of kids that had acting out behavior

21  problems and so I never thought it was an appropriate classroom,

22  but he did get to be mainstreamed for his favorite subjects of

23  math and science.

24      Q.    Okay.  And then in later years in junior high and high

25  school?

1    A.    Junior high, they started him -- he was in a behavior

2  disorder class there because -- in the junior high building in

3  Pleasant Valley where he would have gone to school anyway, but

4  that's where that classroom was for that age level and he ended

5  up before it was over just touching base with homework and stuff

6  with that teacher there, he was mainstreamed from then on.

7    Q.    And I know that from what you've described you've been

8  very active through the years with the school and how to

9  accommodate what special needs Jeremy has had, is that correct?

10    A.    Yes.

11    Q.    And other than that have you had any specific

12  direction or ideas of how to handle some of the challenge Jeremy

13  has had?

14    A.    No, they -- they just gave us a diagnosis and sent us

15  home.  They didn't really tell us that, you know, that there was

16  anything that we could do to make it better, you know, our

17  objective was to get him educated so he could provide for

18  himself as an adult.

19    Q.    When you say get him educated, Jeremy then did

20  graduate from college, is that correct?

21    A.    Yes, he did.  Yes, he did.

22    Q.    And how would you describe his determination to

23  conquer that challenge?

24    A.    Well, he worked really hard at it.  He took quite a

25  few years to do it, but he ended up with a degree in geology,

31

1   one in biology, and one in mathematics.

2       Q.   And I know that there's some reference as well to him

3   participating in the track team, is that correct?

4       A.   Yes, he was on the track team at Augustana.  Really,

5   really shocked us; but he threw the shotput, he threw the

6   shotput, but they let him participate.

7       Q.   Okay.  And it seems for someone that has some social

8   challenge that some of these things would be difficult.  Is

9   Jeremy the type to take on a challenge?

10      A.   Yes, I think so.  He -- if he's interested enough in

11  that challenge, he'll work towards it, because just doing his

12  homework was a challenge, you know, because he's very slow at

13  everything he does and so just succeeding in school was a -- was

14  a challenge for him.

15      Q.   And I want to go back to something you just mentioned

16  too.  You said that your goal was to get him educated and you

17  didn't really know what other direction to follow.  Are you

18  aware now of some of the recommendations made by Dr. Terry?

19      A.   Yeah.

20      Q.   And would treatment procedures or medications, things

21  like that, would that be something when Jeremy is released you

22  would participate in encouraging Jeremy to take advantage of?

23      A.   Oh, yes, yes.

24      Q.   Just so we have your impressions as well, when we talk

25  about some of the social interactions that Jeremy had some

1  challenge with, how would you describe him socially?

2      A.   Well, I think of him like if we would have a family

3  get-together or something at church, he would always be -- he

4  paces.  He'd just be kind of on the outside like the

5  illustration Danny gave.  He doesn't really know how to get in

6  and let -- unless somebody just literally said Jeremy, come

7  here, let's do this.  He wasn't -- didn't join in.

8      Q.   And did that create isolation in his life?

9      A.   Oh, yeah.  Yes, very much so.

10     Q.   And how would you describe that?

11     A.   He was very much a loner.

12     Q.   The other thing we talked about is Jeremy having a

13  focus on particular interests.  Have you observed that through

14  the years with Jeremy?

15     A.   Yes.

16     Q.   And how would you describe that?

17     A.   Well, if he had anything that he was interested in, he

18  would -- he would really -- well, he started liking dinosaurs

19  when he was in kindergarten and that is one of the reasons he

20  got the geology degree because he was -- he's, you know, still

21  enjoys the -- the dinosaurs, the rocks, the fossils, those kind

22  of things, so it is something that he pursued.

23     Q.   Okay.  And with respect to the general character that

24  you have observed in Jeremy, what would you describe as some of

25  the positive, good traits that your son has?

1      A.   He's a very loving, kind person.  He has a

2  sister-in-law and he will do anything for her.  He will be

3  sitting at the table eating dinner and he'll decide he needs

4  something else to drink, there will be four or five, six, maybe

5  ten other people in the room, he'll ask her if she wants

6  something else, not the rest of us, you know, but he -- he just

7  -- he will do anything for her or anybody else that if he was

8  asked, you know, he's -- he's not real good at finding things to

9  do for someone; but if he knows about it, you know, he will.

10     Q.   And have you ever observed any kind of inappropriate

11 behavior or violence or anything like that on behalf of --

12     A.   No.

13     Q.   -- Jeremy through the years?

14     A.   No.  No.

15     Q.   And if, in fact, or when, in fact, Jeremy is released

16 from his sentence, what role would you expect or plan on having

17 in his life from that point forward?

18     A.   As my mother-in-law used to say, he's my son and I'll

19 always be there for him no matter what.

20     Q.   And will you help with some of the planning to help

21 some of the issues that are presented?

22     A.   Yes, whatever I can do to help him.

23     Q.   Okay.  So you will continue to be active.  Do you

24 expect that he would come back to your home?

25     A.   Yes.  Yes.

34

```
1          MS. ZITZNER:  I have nothing else.  Thank you.

2          THE COURT:  Mr. Barrows, did you have questions for

3    Mrs. Gatton?

4          MR. BARROWS:  No, Your Honor.

5          THE COURT:  Thank you very much, policeman.

6          MS. ZITZNER:  Pastor Finley.

7          THE COURT:  Please come forward, sir.

8                    MICHAEL MARVIN FINLEY,

9    witness herein, called as a witness by the defendant, after

10   having been first duly sworn, was examined and testified as

11   follows:

12                        EXAMINATION

13   BY MS. ZITZNER:

14       Q.   Pastor Finley, could you please state your full name

15   for the record?

16       A.   Yes, Michael Marvin Finley.

17       Q.   And Pastor Finley, I want to just start by asking you

18   how you know Jeremy Gatton.

19       A.   I met Jeremy in 1991 when I came to Pleasant View

20   Baptist as their youth pastor.  I was Jeremy's youth pastor, I

21   was his pastor confidante many times in just talking,

22   encouraging him.  Eventually worked on my youth staff as one of

23   my youth workers and I have -- I have known him since 1991.

24       Q.   And how long did you actually have a working

25   relationship with him as a pastor and then in the youth group?
```

1      A.   I would say up until about probably three or four

2 years ago, we resigned from the church there and we were in the

3 area, I still met with Jeremy on occasion, and then we moved

4 away a couple years ago where I am senior pastor of a church in

5 Stratford, Iowa, now.

6      Q.   So roughly 15 years you had some relationship with

7 Jeremy directly?

8      A.   Yes.

9      Q.   And with respect to your observations of Jeremy, let

10 me first talk about the youth group.  You indicated that he

11 worked as part of the youth group, is that correct?

12      A.   Well, when I first had Jeremy, I think he was -- I

13 think he was a junior in high school, and I noticed there was

14 something different about him, I didn't know exactly what it

15 was, and I asked his parents and they told me he is high level

16 autistic, that's what they knew at that time, and I said well,

17 what does that mean, and they said well, he'll take a little bit

18 longer to respond.  I said okay, I can handle that, and many

19 times in classroom settings Jeremy would not participate until

20 usually toward the very end and usually whatever he said was

21 usually pretty profound.  It was always thought very deeply, we

22 constantly teach our kids in the church think before you speak,

23 Jeremy actually did that, most of the rest of them didn't, but

24 he actually did and very deep thoughts and I thought boy, this

25 guy is not -- he's not dumb.  He's got some very deep thoughts,

1   he's far beyond a lot of these kids, except again that social

2   interaction.

3           As he went to college I stayed in touch with him, we

4   would go out for a pizza or something every now and then just to

5   encourage him, see how he's doing in school and those kind of

6   things.  I even went over to his place where he lived one time,

7   we had some time there when he was on the track team, those kind

8   of things.

9           When he got out of college he asked to be on my youth

10  staff.  I was hesitant at first, but I thought, you know, Jeremy

11  has been a solid guy all the years that I've worked with him so

12  I said sure, Jeremy, don't know how we will work this out, but

13  come on staff.  We had two different ministries at that time

14  when Jeremy first came or when I first came to know Jeremy, it

15  was the first time the church had a youth ministry so we had to

16  combine our high school and junior high ministry people together

17  and one thing I learned about Jeremy very quickly on, he was

18  very focused.  Even in playing games --

19      Q.   Let me ask about that.  What types of things did you

20  have Jeremy do with respect to the youth group to assist or

21  help?

22      A.   Well, in -- we're going back now after his college

23  years when he was working as a staff member.  He would -- at

24  first I didn't know how to use him to be honest with you.

25  Normally the volunteer staff I have were college age and some

1   cases high school seniors and the college age work with our high

2   school students, some of our high school students would work

3   with our junior high students who had college age there as well

4   and normally what they would do is my volunteers would teach

5   courses or subject matter, if we were talking about dating or

6   loneliness or forgiveness or whatever, but we would also do some

7   small group things where kids would -- they would have printed

8   out questions and they would lead that.

9          We tried Jeremy doing a large group setting and that

10  didn't work well, he just really struggled with that; but in a

11  small group setting, because everybody had their questions

12  mapped out, he did quite well in that because he could read the

13  questions and he would get the interaction from the boys he

14  would have and those kind of things and that worked pretty well;

15  but still I felt there's something we're missing here and then

16  finally it dawned on me Jeremy loved the computer, was always

17  talking about the latest things he had discovered about

18  dinosaurs or something, and I thought this guy is really good at

19  research and so what we eventually had Jeremy do is he was kind

20  of our researcher and so I would say okay, Jeremy, so and so is

21  going to be doing a session in a week and they are going to do

22  it on forgiveness.  I want you to find everything out there you

23  can find about forgiveness, illustrations, stories, Bible verse,

24  whatever, and then you e-mail it to them.  Two weeks from now

25  somebody is going to do something on Christmas and the gifts of

1   the Magi, I want you to find out everything you can about gifts

2   of the Magi and I didn't know you could find that much about

3   gold, frankincense, and myrrh, probably more than I wanted to

4   know, but he would do that and that's where we used Jeremy, he

5   became our researcher, so he was no longer doing sessions as it

6   were because I didn't feel that was the best use, but he would

7   do the research and like I said, I said before, he was like a

8   bulldog, he would get you way more than you ever needed and then

9   the students who are putting that session together would have to

10  sift through it so that's where we used him and I thought he did

11  an excellent job on that.

12       Q.   Now, with regard to the interaction in the youth

13  group, was there ever anything inappropriate reported with

14  Jeremy or anything that was a problem with Jeremy?

15       A.   There were only two things that I could think of along

16  these lines, one was when we first started the youth group, we

17  would play a particular game where you had to run after a ball

18  and it was a free-for-all kind of thing, you had to get it and

19  then you'd bring it back to the group and throw it and if you

20  hit them you traded places and Jeremy just with that bulldog

21  tenaciousness, he would go after the ball, didn't matter who was

22  in his way, he would knock them flat.  Not that he was

23  intentionally trying to do that, it was just the way Jeremy did

24  things and finally I pulled him aside, I said Jeremy, when the

25  girls run for the ball, I said you got to look before you go

1    after that.  If there's a girl there, you need to slow down, you

2    need to pull up kind of thing.  I said if it is a guy, they're

3    on their own, that kind of thing, and after that every time he'd

4    go for a ball, just before he got there, he'd look and if he saw

5    a girl anywhere near, he would just stop, turn around, walk back

6    to the group and wouldn't even pursue the ball and I thought

7    that was a little bit of an overreaction, but at the same time

8    what I told him I felt was a little bit inappropriate, he stuck

9    with it.

10        Q.   In your experience with Jeremy would he tend to

11   respond to that redirection?

12        A.   Oh, yeah, yeah, once I told him either, you know, you

13   need to modify your behavior here, you need to do something

14   different, never had a problem, he always did it, he always came

15   through on that.

16             One other time when he was on my youth staff sometimes

17   parents are -- where we had our meetings was across the street

18   from the church at an elementary school and sometimes parents

19   would drop their kids off and wouldn't always pick them up so we

20   had -- youth staff had to drop these kids off and Jeremy again,

21   always willing to help, he had basically a carload of kids to

22   take home and that was fine, but I have noticed he had a girl --

23   one of the girls there, she just jumped in too and I pulled him

24   aside and I said we need to have the girl staff take the girls

25   home and you take the guys home and he said okay and he said you

1    need to go to so and so and she got out and went with so and so

2    and we have never had a problem with that and he just wasn't

3    aware that staff girls took girls home and staff guys took guys

4    home.

5         Q.   Did he respond to the redirection?

6         A.   Yes.

7         Q.   Appropriately so?

8         A.   Yeah, he went right back to the gal and said you need

9    to go with so and so, you know.

10        Q.   Was there ever any concern of any inappropriate

11   contact, interaction, things of that nature with individuals in

12   the group?

13        A.   Never, and I saw Jeremy on -- we took him on several

14   mountain climbing rapelling trips that he was on with a lot of

15   guys, girls his age, never saw any of that, always helpful,

16   always willing to get gear up the mountain, wash dishes,

17   whatever it took to make the trip successful.  Went on a lot of

18   trips with him and never saw any of that at any time.

19        Q.   How would you describe Jeremy's character?

20        A.   He's honest to a fault.  If -- if he's done something

21   wrong, he will let you know that.  If he is aware that it is

22   wrong, if you challenge him, say did you do this, yup, I did

23   that, so he's honest in that sense.  He's honest with other

24   people too.  Sometimes that can be inappropriate in the sense

25   that if they have done something wrong, he will let them know

1   that as well; but he's faithful, hard worker, I don't care what

2   we were doing, if Jeremy was there, he would usually outwork

3   anybody because he was -- he was very -- he would use his

4   strengths in appropriate ways.

5           Jeremy usually would not defend himself though.  That

6   always bothered me.  His brother who is younger and much smaller

7   than Jeremy I know got in several fist fights just protecting

8   his brother and I said, you know, I always told him, you did the

9   right thing, you know, Jeremy was just not the type -- Jeremy

10  would defend others, but he usually wouldn't defend himself.

11      Q.   Did you see him get picked on at times for some of

12  the --

13      A.   Not from our youth group, we loved him because he was

14  one of us, but I do know he was picked on at high school a lot

15  and that's when I knew him was in his high school years.  He was

16  picked on quite a bit.

17          MS. ZITZNER:  All right.  Thank you.  There may be

18  some questions.

19          MR. BARROWS:  Just a couple, Your Honor.

20                          EXAMINATION

21  BY MR. BARROWS:

22      Q.   Good morning, Pastor.  I take it you found -- I take

23  it you found Jeremy to be a very intelligent young man?

24      A.   Very.

25      Q.   And from your testimony I take it he understood the

1    rules certainly at least after you explained them to him?

2        A.    Yeah.

3        Q.    Explained those to him, is that correct?

4        A.    Yes.

5              MR. BARROWS:  I have nothing else, Your Honor.

6              THE COURT:  Thank you, sir.

7              MS. ZITZNER:  That's all the testimony, Your Honor.

8    The Court has had an opportunity to both read and hear a lot of

9    social background relating to Mr. Gatton and I think that Jeremy

10   presents probably the most unique case that I am aware of that's

11   come before the Court because I think a lot of the components of

12   the disorder that he has been challenged with throughout his

13   life perhaps has contributed to the offense itself.

14             As is described in the DSM-IV as well as from the

15   psychologist that you heard from and the report you have seen,

16   people that have Asperger's disorder characteristically have

17   some difficulty with social interaction and judgment combined

18   with the very repetitive type of behavior and I think what

19   Jeremy in lay terms would say, he didn't characterize what he

20   was seeing as real and that he was just -- how he says it

21   finding what he could find because he knew it shouldn't be

22   there, kind of this dogged searching behavior.  I think that

23   likely led him to the offense and certainly the amount of

24   material that was involved in this particular case; but I don't

25   think it corresponds to the type of threat or seriousness that

1   is involved in this particular case.

2          I think that what you have heard about Jeremy is that

3   he's a person of good character, he's done a lot of actually

4   very remarkable things, someone that's challenged socially, but

5   has taken on going to college, seeing it through even if it took

6   longer, took on extracurricular activities, as the Court can see

7   in the Presentence Report, he has not only done volunteer work

8   that we have heard about today in court, but he's also been

9   gainfully employed.

10          He's a person that is loyal to his family, close with

11  his family, has throughout his life been taught right from wrong

12  and has a general grounding of right from wrong.  He's also

13  someone that has been responsive to redirection and input from

14  others and adjusted his behavior accordingly when that has come

15  up throughout his life so I think that this is an instance where

16  that type of redirection and that type of adjustment of behavior

17  is what is going to be the most effective and the most sensible

18  approach in this particular case.

19          What the Court has heard today and what I have heard

20  through talking with Jeremy's parents as well as his pastor,

21  throughout Jeremy's life he's had this ability to have just a

22  narrow focus where he takes the focus too far, whether it be an

23  interest in something innocuous such as dinosaurs and he

24  researches everything there is on dinosaurs, whether it be a

25  research project that he is given through the church work that

1  he does and he continues to research it, research it, research

2  it until he has every last fact that is available on that topic,

3  he has a very narrow focus and he continues this repetetive

4  behavior; but combined with that he has the ability to redirect

5  that, combined with that he has lived a life where there's no

6  type of indication of violence, there's never been any

7  inappropriate type of contact with anyone, there's been never

8  any type of inappropriate interactions, anything similar to the

9  type of offense that he has today.

10         Asperger's disorder is something that was earlier

11 characterized as high functioning autism, but it is something

12 that was prevalent and observable in Jeremy at a very early age

13 and I think because of that, as you can see from the

14 psychological report, as you can see from accounts from family

15 members, that even in the article that summarizes some of the

16 things Jeremy has strived to overcome in his life, there's been

17 this social awkwardness and I think that in addition to the

18 repetitive behavior that has contributed to this offense,

19 there's also the social isolation that has contributed to this

20 current offense and quite honestly there hasn't really been a

21 plan in place where his parents could say here is what we can do

22 to try to help direct him and help him pass some of these

23 obstacles socially, some of these obstacles that he has with

24 social judgment, some of these obstacles with repetitive

25 behavior, they haven't really had a course of action or a plan

1  in place and I am sure the Court can tell from just the

2  testimony today from Mr. and Mrs. Gatton that they are people

3  that are very dedicated to trying to encourage and help their

4  son succeed in any way that they can.

5        Throughout his school years they were actively

6  speaking with school officials, they took him for evaluations,

7  when he was struggling with flag football his father jumped in

8  to coach the football program to help his son still be able to

9  participate, but yet help guide some of the behavior so they're

10 very proactive and what we have now is we've got obviously the

11 insight of the problem, we've got a diagnosis of exactly what is

12 causing it, and how some of the treatments go to help someone

13 overcome the social interaction and isolation and making better

14 judgments and we've got a support system that is ready to go and

15 active and very enthusiastic about helping Jeremy do that.

16        I know that Jeremy gets very nervous and has written a

17 brief statement that he wants to make to the Court, but you have

18 heard from his family and certainly I've had the added

19 opportunity of hearing from Jeremy himself is that he's very

20 embarrassed by this, he feels ashamed of his conduct, it is not

21 just his parents that are going to be motivated to make the

22 adjustments, Jeremy is motivated to make the adjustments and

23 just like he may take redirection on smaller things, if someone

24 says this is inappropriate, you can't plow through kids that are

25 smaller than you and then he just goes a 180 direction the other

1  way so he doesn't do it, just like he takes those adjustments in

2  a smaller area and listens and acts accordingly, he's got the

3  ability to take that redirection in this area even though it is

4  obviously a more serious context.

5          Obviously his parents are going to also be very

6  observant of what is going on in identifying the issue as well,

7  but there's certainly an internal motivation that Jeremy has and

8  one thing that is clear throughout his life is that he has had a

9  very determined spirit to make his life productive.  I mean,

10 even the article that was in the Journal -- the Quad-City Times,

11 it shows how he wanted to get past this label that he had had

12 and achieve things that other people achieve and get the college

13 degree that he wanted and he decided to participate in the track

14 team because that would help him integrate socially, in the

15 church group, he had a very determined spirit to get his life in

16 a good direction and I think he can also use that same

17 determined spirit in this particular case to make sure that he

18 deals with the treatment that is recommended and the counseling

19 and help him work past this isolation that he's had in his life

20 and live a more constructive life for himself to be happy.

21         What I would also point out is I think that Jeremy

22 presents a unique case in just the effect that the sentence has

23 on him.  I know that the Court has heard about how he has been

24 in jail.  Jeremy has felt physical pain since he's been there

25 and I think the best explanation, because I've talked to the

1  nurse staff and reported, you know, he seems to feel that

2  there's a chest pain or an abdominal pain or irregularity,

3  things of that nature, I think it is just from the stress of

4  knowing that this offense has shamed him and his family, it is

5  the stress of being in this environment that is completely

6  uncontrolled even when he's had a very controlled, nurturing

7  environment with his family, and just the complete change in his

8  life and I think certainly incarceration has had a much more

9  dramatic effect on Jeremy than it has on the average person.

10         I was up speaking with Jeremy Friday afternoon into

11  the evening and he explained to me that he had been moved into

12  this area with the trustees and so I asked the guy behind the

13  glass at the control area why there had been a move and they

14  said that what they understood was that people were giving him a

15  hard time and because he was having a hard time, people were

16  making fun of him and so forth, they moved him to an area that

17  was easier for him so not only have the family and the

18  professionals seen that there's been some impact on him,

19  obviously it looks as if the jail staff has seen that as well.

20         I know when I was talking with Jeremy there was this

21  constant pounding throughout our interview because someone was

22  in a cell and Jeremy described it as they were kicking at the

23  cell because it was someone that didn't want to be there and

24  they kept kicking it and it was something that had happened much

25  more regular than I guess when I have been there, but those are

1  the types of things that are even more extreme for Jeremy with

2  his condition than what an average person might deal with and

3  obviously you have seen throughout the reports he has social

4  lack of confidence, he expects disparaging responses, he has a

5  hard time interacting with others.  Obviously in the jail

6  population that is even more aggravated because people maybe

7  aren't as sensitive to some of those issues, it is not the same

8  nurturing environment, so I think the treatment that could very

9  well address the concerns that are raised would certainly be

10  most effectively provided in another setting on a long-term

11  basis.

12          Jeremy has done a lot of thinking and understanding

13  about accountability and understands that there's a punishment

14  and that there definitely will be a prison sentence today.  His

15  family understands that and I know that the recommendation I

16  made in the Sentencing Memo is a drastic recommendation for a

17  departure, but I think that it is warranted in this case, that

18  there truly is a plan that can be put in place to help Jeremy

19  move on from this without any threat to the public and his

20  family is on board, Jeremy is on board, there's professional

21  diagnosis that will start the direction that needs to be taken

22  so I think it makes sense in this particular case.  The

23  punishment is also definitely extreme punishment in light of

24  just the impact it has on Jeremy to live in this chaotic

25  environment when his whole life has been controlled to help him

1    sort through some of the things he has difficulty dealing with.

2          THE COURT:  Thank you.  Mr. Gatton, is there something

3    you'd like to say before the Court imposes sentence?

4          THE DEFENDANT:  Yes.  I very deeply regret my actions.

5    What I did was horrible.  I used my time poorly and did not

6    guard myself from evil and brought this shame upon myself and in

7    the future I shall use my time better.  I shall refrain from

8    these actions and I shall strive to act with integrity and

9    virtue.

10          THE COURT:  How did it start?

11          THE DEFENDANT:  The finding child pornography?

12          THE COURT:  Yeah.  What got you interested in the

13    beginning?

14          THE DEFENDANT:  I like to find things and I stumbled

15    on it quite by accident.  I have -- I figured out the search

16    terms that you need to use for -- to find it on Google and I --

17    one of the first times I found it I -- like if I was watching

18    The Tonight Show, I might Google whoever was a guest on The

19    Tonight Show and -- or if I heard a phrase or something I might

20    know anything that would pique my interest, I ran into some

21    pictures of minors that might commonly be described as jail bait

22    and got trapped by some of those and some earlier pictures I

23    found were also Brooke Shields when she was a minor did some

24    movies that she appeared nude in and that was one of the things,

25    you know, I figured well, anybody with a credit card can go to

1   Amazon.com and buy one of these movies.

2          THE COURT:  Just a minute ago you used the word

3   trapped.  Why did you use that word?

4          THE DEFENDANT:  I'm trying to remember how I used it.

5          THE COURT:  You said that you found pictures of

6   underage minors and you felt trapped by them.  Just not a good

7   choice of words?

8          THE DEFENDANT:  I just --

9          MS. ZITZNER:  Can I interject?

10         THE COURT:  Go ahead.

11         MS. ZITZNER:  I just want to say from my own

12   interactions with Jeremy, as you saw when he had everything

13   written down, he is comfortable and he talks in kind of a pace

14   we expect.  When he gets nervous there's this pause and he has a

15   hard time coming up with words and I don't know why he used a

16   particular word, but I know he's expressed that he's the one

17   that's done this consistently and I think he has more difficulty

18   coming up with the exact way to express himself than many people

19   usually do.

20         THE COURT:  I accept that.  Is there anything else you

21   wanted to say?

22         THE DEFENDANT:  No, Your Honor, I have no further

23   comments.

24         THE COURT:  Thank you.  Mr. Barrows?

25         MR. BARROWS:  Thank you, Your Honor.  Well, Your

1  Honor, rarely -- rarely do we have in here what I would call a

2  happy outcome.  There are certainly no happy outcomes here

3  today.  This is a heartbreaking situation, particularly for Mr.

4  Gatton's parents, and I feel for them and I do believe that Mr.

5  Gatton is remorseful.  Still, there's no denying what happened

6  here, it was bad and must be punished.

7       I would note particularly the conduct described in

8  Paragraph 6 of the Presentence Report and I think also some of

9  the things that Mr. Gatton admitted to in Paragraphs 16 and 17.

10  Those things are troubling and based on what I heard today, they

11  are not entirely explained by his condition as described.

12       THE COURT:  It explains the compulsiveness, what

13  appears to be an obsession with this stuff, but it doesn't

14  explain the onset.

15       MR. BARROWS:  Right.  Still, Mr. Gatton's unique

16  situation, you make -- at least I suspect this Court in this

17  kind of situation and in the government's opinion warrants a

18  variance.  While Mr. Gatton certainly understands the rules as

19  we have heard, one certainly has to wonder to what degree his

20  condition contributed at least to the egregiousness of the

21  offense.  I know the Court has rarely heard the government

22  suggest a variance, but in my experience handling these types of

23  cases, I would say that this one -- this one warrants it.  Thank

24  you, Your Honor.

25       THE COURT:  What sort of a range are you thinking

1   about?

2          MR. BARROWS:  This is one of those situations, Judge,

3   where I am glad I don't have your job.  This is an awfully tough

4   call.  Do I think it warrants going down to 60 months?  No, but

5   I think it warrants a significant variance.

6          THE COURT:  As I looked at the advisory Guidelines,

7   for example, and subtracted out simply the enhancement for in

8   essence the repetitive nature of the behavior, that went from

9   210 to 240 down to 121 to 151.  That is just taking off the

10  enhancement for the number of images here.

11         In fashioning an appropriate sentence, I have

12  considered all the factors found in Title 18, United States

13  Code, Section 3553(a).  I have considered the nature and

14  circumstances of this offense and I have considered the history

15  and characteristics of Mr. Gatton.

16         Earlier in the proceeding I was describing the

17  materials that I had received.  I neglected to mention that I

18  had also received the Quad-City Times article from when Mr.

19  Gatton graduated from college.  I also received in addition to

20  the insightful letter from his pastor, a similarly insightful

21  one from his parents, yet another.

22         I have considered the seriousness of this offense.  It

23  is serious for a number of reasons.  We talked at length about

24  the number of images here and the reasons for it.  We haven't

25  talked about what those images depicted and we are talking about

1  terrible, terrible, terrible material here.  Mr. Gatton engaged

2  in active distribution of these materials.  Almost all the

3  people we get whose sentences are enhanced for distribution are

4  the more passive distribution by simply having the materials on

5  peer-to-peer file sharing programs and the manner in which the

6  behavior for which Mr. Gatton got caught was also particularly

7  disturbing.

8         I have considered the question of just punishment and

9  in that regard have considered his lack of criminal history.  I

10  have also considered the effort that it has taken for him to

11  receive his education, volunteer, and be otherwise a productive

12  member of society.

13         I have considered the need for adequate deterrence to

14  criminal conduct and I have considered the need to protect the

15  public from further crimes.  While his disorder might very well

16  explain the number of images that he possessed, it also gives me

17  concern when I consider the need to protect the public from

18  further crimes.

19         I have considered the sentencing options that are

20  available to the Court as well as the kind of sentences and the

21  advisory sentencing range established by the Guidelines.  The

22  Sentencing Guidelines are not mandatory, they are an important,

23  but in no way controlling factor to be considered here.

24         I have considered the need to avoid unwarranted

25  sentencing disparity among defendants with similar lack of

1 records who have been found guilty of this conduct and I have

2 considered the way in which this crime repeatedly victimized in

3 a terrible way those whose images are out there on the Internet.

4       I have considered his medical and emotional history

5 and his family and community support.  It is really very rare to

6 see someone in that chair with such a loving family and other

7 support system.

8       After considering all of the factors that I have

9 identified, after considering all the other materials that have

10 been provided and the arguments made here, I conclude that the

11 Guideline sentencing system inadequately addresses the

12 circumstances of this defendant and that the Guideline

13 sentencing range is unreasonable.  I pronounce the following

14 sentence that the Court believes is sufficient, but not greater

15 than necessary to address the essential sentencing

16 considerations.

17       It is the judgment of the Court that the defendant,

18 Jeremy Allen Gatton, is hereby sentenced to the custody of the

19 Bureau of Prisons for a term of 90 months on Count 1 and 90

20 months on Count 2 of the Indictment, those sentences to run

21 concurrent, meaning at the same time.

22       Upon release from prison you shall be placed on

23 supervised release for 10 years.  Within 72 hours of release

24 from the Bureau of Prisons you shall report in person to the

25 probation office in the district where you are released.

1          While on supervised release you shall not commit

2     another federal, state, or local crime.  You shall not possess a

3     firearm or destructive device.  You shall not illegally possess

4     a controlled substance.  You shall comply with all the standard

5     conditions of supervised release set out by our Sentencing

6     Commission, plus the following special conditions.

7          Before I pronounce those, I have one question for the

8     probation officer.  Ms. Tady, would you come forward, please?

9          (An off-the-record discussion was held.)

10          THE COURT:  You shall not use or possess a computer or

11    access the Internet without prior approval of the probation

12    office.  Similarly you may not possess any type of camera or

13    video recording device without their approval.  You shall not

14    view or possess any form of pornography, sexually stimulating,

15    or sexually oriented materials.

16          You shall not enter any location where pornography is

17    the primary product for purchase or viewing.  You shall not

18    enter any location where the primary function is to provide

19    so-called adult entertainment.

20          You shall not have contact with children under the age

21    of 18 without the prior approval of the probation office.  You

22    shall participate in a sex offender treatment program to include

23    psychological testing and polygraph examination.

24          You shall comply with all sex offender registry laws

25    for the state in which you are to reside, including but not

1 limited to registering with the local sheriff's office within

2 the applicable time frame.  You shall submit to a search of your

3 person, residence, adjacent structures, office, or vehicle

4 conducted by a probation officer.  All of these things are more

5 fully set forth in the Judgment Order to be entered today.

6          I find that you do not have the ability to pay a fine.

7 You are ordered to pay a $200 special assessment to the Victims

8 Assistance Fund.  That is due and payable immediately without

9 interest to the Clerk of Court.

10          I recommend first of all that the Bureau of Prisons

11 designate him as soon as possible.  A local jail is not the

12 place for Mr. Gatton.  You will find that when you're designated

13 to an institution, you will be in a much more tolerable place.

14 I recommend that in designating that they take into

15 consideration his Asperger's disorder.  I wouldn't pretend to

16 know where in the Federal Bureau of Prisons is best for him.  I

17 suspect that they ought to consider first a medical facility and

18 that's probably where he will go.

19          The Judgment will reflect forfeiture of the materials

20 found in Count 3 of the Indictment.

21          You have right to take an immediate appeal from this

22 Judgment and Commitment Order.  Any appeal has to be filed

23 within ten days from today.

24          Ms. Zitzner, do you have anything else?

25          MS. ZITZNER:  No.  Thank you.

1           THE COURT:  Mr. Barrows?

2           MR. BARROWS:  No, Your Honor.

3           THE COURT:  We are in recess.

4           (Proceedings concluded at 12:30 p.m., September 8,

5    2009.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

58

1                         C E R T I F I C A T E

2

3

4              I, the undersigned, a Certified Shorthand Reporter of
    the State of Iowa, do hereby certify that I was called in the
5   capacity of a Certified Shorthand Reporter to report the
    foregoing proceedings in the above-captioned matter and that
6   same was taken down by me in stenotype and later reduced to
    Computer-Aided Transcription under my supervision and direction,
7   and that the foregoing Transcript of Proceedings is a true
    record of the testimony given and all objections interposed and
8   rulings made thereon.

9

10             I further certify that I am neither attorney or
    counsel for, nor related to or employed by any of the parties to
    the action in which these proceedings were had, and further,
11  that I am not a relative or employee of any attorney or counsel
    employed by the parties hereto or financially interested in the
12  action.

13

14             Dated at Davenport, Iowa, this 7th day of January,
    2009.

15

16                    /s/ Linda Faurote-Egbers
                      Certified Shorthand Reporter
17                    and Notary Public
                      Linda Faurote-Egbers
18                    Notarial Seal
                      Commission Number 223944
19                    My Commission Expires 8-10-11

20

21

22

23

24

25